Next case for argument will be Washington State Health Care v. Centers for Medicare & Medicaid Next case for argument will be Washington State Health Care v. Centers for Medicare & Medicaid Next case for argument will be Washington State Health Care v. Centers for Medicare & Medicaid Next case for argument will be Washington State Health Care v. Centers for Medicare & Medicaid I don't know if we have anything on the record on this. What was the rationale behind the initial Washington law saying that these dental hygienists could not, by themselves, offer certain services? Yes, thank you, Your Honor. The Washington legislature made a policy choice to address the oral health care crisis in Indian Country, a crisis that is specific and unique to tribal territories. CMS itself concedes that there is a special and unique oral health care crisis in Indian Country. So the state of Washington, in recognition that the federal government had not fulfilled its duties in this regard, teamed up with all of the tribes in the state and the Dental Association to create this new program in 2017. Before we get to the tribal part, I'm asking about everyone else, so to speak. As I understand, correct me if I'm wrong, the Washington law is that other than on the tribe, otherwise available dental hygienists cannot offer these services on their own. And what was the reason that Washington made that determination? Our record doesn't reflect all that detail. I agree, but that's why I was curious as to whether you had any insight into that. And whether there's some suggestion that it's really a compromise because of the dental lobby. Well, I think that this court can understand that all laws are made with politics in mind. And the legislature made its policy choice in this case specifically to address the oral health care crisis in Indian Country. I would note as well that this court in Betlock, when interpreting the free choice law, emphasized that states retain the authority to regulate the practice of medicine in their states and to otherwise determine the professional qualifications of health care practitioners in the states. The qualified isn't our problem here. And I think the heart of the matter that we need to wrestle with is this word, willing. So is there any evidence that the DATS, I don't know if that's how it's pronounced, D-H-A-T-S. We love our acronyms. Yes, that's an easy one to remember. But is there any evidence that they provide care beyond the tribal circle? No, and you're exactly right, Your Honor. There's no evidence at all that these dental therapists are willing to provide services outside the tribal context. And so that brings me to kind of a second part, or there's really a third part. Is there willingness circumscribed in effect because of state law? There's no evidence in this regard. For example, this court noted in Betlock that one way to determine a provider's willingness to further services is to introduce evidence in that regard, testimony at the hearing or a declaration or an affidavit. CMS had every opportunity to introduce such evidence, and CMS did not do so. In the same vein, is there any evidence that anybody outside the circle asked for these services? You're absolutely correct, Your Honor, and thank you. There's no evidence in the record that any person other than those eligible for Indian health service care has knocked on the door of the tribal clinic and said, hey, I want services too. There's no evidence that that has ever happened. If CMS had such evidence, it could have presented it. For that matter, if individual clients want to raise such a claim, they could, but that has never happened in the five-year existence of the DHAT program. Supposing, and I'm sure this is contrary to fact, but just as a hypothetical, Washington had said as a prelude to this enactment of this legislation, we think dental hygienists are really not qualified to give these services to most people. However, things are so desperate in this particular reservation that something is better than nothing, so we'll allow it there. Would that not offend the qualified component of the Medicaid regulation? No, it would not, Your Honor. In fact, it would be totally consistent with this Court's decision in Betlock where the Court noted, as I mentioned, that states retain the authority to determine the scope of practice of health care practitioners in their states. So in this situation, Washington made the policy choice to create a new program to address this unique crisis and outlined the qualifications and licensure that a dental health aid therapist would need. And if Washington decided in the future to change that, Washington retains the right to do it, just like other states have the right to define the scope of their programs. So if one of the difficulties with the record is that there's not a lot in there on what does willing mean or an interpretation by the federal government, where should we look for that? Or what does it mean if there's really an absence of an explanation of that in the decision? Well, I believe that the Court should look at the record. So if there wasn't any evidence about willingness, then presumably it would be in the record, but CMS failed to present any evidence in that regard. And as Your Honors, I think you were alluding to a minute ago, it is true that you can't divorce qualified from willing. So here, for example, it would make sense that a dental health aid therapist who has received licensure under the current regime in Washington would be unwilling in that sense to provide services outside the tribal context because the license is limited to practicing in Indian Country on those who are eligible for care through the Indian Health Service. And again, a policy choice that the state had every right to make. So, Counsel, if I may interject a question, please. Did the CMS make any statement about willingness in its decision? And if it did not do that, do we need to vacate and remand for it to address the issue? Thank you, Your Honor. I don't recall that there was a lengthy discussion of willingness in the CMS final decision. However, I don't believe that remand is the appropriate option. I believe that Washington's law and plan amendment comply with the free choice law. Washington's law and plan amendment are consistent with congressional intent in Section 1911 of the Social Security Act, which I'd like to talk about briefly. In 1976, Congress enacted Section 1911 of the Social Security Act as part of the Indian Health Care Improvement Act. This law, for the first time, allowed Medicaid, excuse me, allowed tribal providers to become Medicaid providers and receive Medicaid funding. Congress, when it enacted this law in 1976, the free choice law in Section 1902 had already been on the books for nearly a decade. Similarly, the Indian Health Service rules regarding eligibility for services had been on the books since 1956, even before the beginning of the Medicaid program. Congress clearly intended tribal clinics to be eligible for federal Medicaid funding under Section 1911. As this Court said in Betlock, Congress means what it says and says what it means. As this Court said earlier this year in a case called U.S. v. Merrill, Congress does not act in a vacuum. Courts presume that Congress is aware of existing law when it enacts new law. In 1976, when Congress enacted Section 1911, it knew exactly what it was doing. Congress was recognizing the nation's obligations to the health and well-being of tribal members. Congress was aware that funding through the Indian Health Service had been woefully insufficient. Congress was aware of the free choice law and of the IHS eligibility rules. Congress, nonetheless, passed this law for the express purpose of allowing additional funding to tribal clinics. And, indeed, for the 42 years after the enactment of Section 1911, CMS itself always interpreted the free choice law in conjunction with or in harmony with Section the appropriately harmonized, let me rephrase that, for 42 years after the enactment of Section 1911, CMS always correctly harmonized Section 1911 with the free choice law to allow federal Medicaid funding to tribal clinics in the state of Washington. And what is the support for that? For the enactment of Section 1911? No, that you're saying that that had been harmonized to permit the Medicaid funding. We do have testimony in our record from the state's Medicaid director, who had been involved in Medicaid for more than 25 years, and the Swinomish Tribe's health care administrator, who had been involved in health care matters with the tribe, including on technical committees with CMS for nearly 40 years, that the state of Washington and the Swinomish Tribe had never been told that funding was going to be denied to the Medicaid program or to tribal clinics because of the free choice law. There's no evidence to the contrary. Does application of the free choice law require as a condition that the providers be both qualified and willing? Yes, Your Honor. Medicaid recipients, generally speaking, have the right to be seen by providers who are both qualified and willing to see the Medicaid patient. If a Medicaid provider does not want to see a Medicaid patient, he or she does not have to. The mere fact that they signed up for the program doesn't mean they have to see anybody who comes in the door. But the point is, under the free choice law, the provider must be both qualified legally to perform the service and willing, as a practical or factual matter, to perform that service. Washington's plan, yes, Your Honor. Can you give us some other examples of that where the provider would not be willing? Well, again, we don't have this in the record, but since I've been doing this for 26 years, I can tell you that, for example, there's one portion of the Medicaid program that's called fee-for-service. The other part is called managed care. In the fee-for-service program, a doctor, hospital, dentist, whoever, signs up with the state to become a Medicaid provider. They sign a standard form agreement. Then that gives the provider the right, if he or she so chooses, to see a Medicaid patient. But they're not obligated to do so. There's all sorts of practitioners in the state of Washington who limit their Medicaid book of business for various reasons. Okay. Do you want to save the remaining time? Yes. Thank you very much. I appreciate your time, Your Honors. The question I was going to ask you, but I've rejected, was just when you quote Congress says what it means and means what it says, I wonder if there's the slightest empirical support for that proposition. I'll pass it on. I'm glad I didn't have to answer that question. You don't have to comment on that. Thank you. Good morning. May it please the Court. I'm Stephen Luquier. I'm the legal director for the Swinomish Indian Tribal Community, and with me here today is Swinomish Tribal Chairman Steve Edwards. Before I turn to the points that I had intended to talk with you about, I wanted to respond to some of the questions that you raised when Mr. Stevens was talking, particularly about willingness. One of the questions was did CMS address willingness? If you look at page 16, and I apologize, Your Honors, I don't have the excerpt citation for you, but if you look at page 16 of the CMS administrator's final decision, they refer to the qualified prong of the free choice of provider statute. They do not talk about willingness. That's not a surprise because earlier in the decision, on page 14, and I'll read this to you, the CMS administrator's decision says, CMS has not claimed that an IHS clinic that declines to provide services to Medicaid beneficiaries who are not IHS eligible slash tribal members is violating the free choice of provider requirement. In that case, such a provider is unwilling to treat the beneficiary, with the term, in quotes, willing, a necessary element of the requirement. And so that is what CMS has said in their final decision. Turning to your question, Judge McKeown, about, well, where does the willingness fit in? Is that a matter of state law? Our position is that the willingness must be assessed in light of both federal law and in light of the Alaska or the tribal qualifications for a dental therapist or a DHET. Federal law clearly provides, and we discussed this at length in our briefing, that only IHS eligible beneficiaries may receive medical treatment in Indian health programs and Indian health facilities. So regardless of what the Washington legislature said in their statute authorizing dental therapists, the providers who are giving services at Indian health facilities are constrained by those IHS regulations. In a standard proposition, whether it's a Swinomish or the Quinault or some other tribe, if I show up, I will not be serviced under an IHS provider, correct? Unless you meet the criteria under the IHS regulations that have been in effect since the 1950s, about two decades before the free choice of provider provision was adopted and before Congress specifically provided that Indian health facilities should receive Medicaid benefits. Congress knew that they were essential, that Indian health facilities were underfunded, that Medicaid was essential for them. They knew that IHS facilities were not available to the general public, only to people who met the eligibility requirements, but they still wanted Medicaid to go to those facilities. But if you take the administrator's decision as you read it, that you don't violate the willingness clause if, in fact, the individual showing up is not eligible, and then you jump to state law, which basically says that with respect to this kind of a provider, a provider who is qualified but cannot be a willing provider because of state law. So is there any difference between the state law prescribing it and the federal law prescribing it, the ability to service outside of the circle? We think that the state law is simply reflecting the reality of the federal law. Dental therapists, as the court knows, began in Alaska. Congress, in the Indian Health Care Improvement Act, said dental therapists could be utilized in Indian health programs outside of Alaska if a tribe elected, which Swinomish has done, and if a state authorized them, which is what Washington has done. So the Washington statute really needs to be looked at in the context of the Indian Health Care Improvement Act providing for nationalization of dental therapists. So what would be the Swinomish's position, then, with respect to Judge Gould's question of whether the case should be sent back so CMS could revisit the willingness clause with more specificity? Well, they have said, yeah, I don't think that remand is necessary, Your Honor. CMS acknowledged in the decision that I read to you and also in their briefing that they have no concerns with the limitations on eligibility that are in federal law. They have said they have no concerns with the limitations on eligibility for services in Indian health facilities that are in tribal law. And the Swinomish Dental Licensing Code specifically says that practitioners who are licensed are only eligible if they are practicing as Swinomish tribal employees working in the Swinomish Dental Clinic. Similarly, if you look at the- And that's under the broader rubric of the Indian Health Service provider, the Swinomish Clinic? So the dental license, yes, that's right. So the Swinomish Dental Clinic, all of the Swinomish health care facilities, are compacted with the Indian Health Service. So they are all the federal programs being carried out by the Swinomish tribe. I think it's important, though, Your Honor, that because we know that this program started in Alaska, that if you look at the certification board standards, which are in the record, as is the Swinomish Dental Licensing Code, just like the Swinomish Licensing Code, the Alaska certification requirements say that to be eligible for certification, you must be practicing in an IHS or a tribal health facility that's compacted with or contracted with the Indian Health Service. So I think the reason I wanted to talk about the Indian Health Care Improvement Act that gave rise to the dental therapy program outside of Alaska is the state law, the tribal program, the Alaska certification board, they all fit together. They're all consistent. They are all carrying out Congress's intent to provide health care to Native communities to address the really gross disparities in health care, dental care for purposes of today, but for all health care. In some cases, the Alaska Natives have additional rights or different rights than some of the tribal communities in the lower 48. Is there anything here that would distinguish the Alaska situation from the situation here? The statutory framework for the Alaska system is a little bit different. I mean, if you look at the Indian Health Care Improvement Act, there is a, I don't remember if it's a chapter or a separate section that addresses the community health aid program, which is what dental therapists were a part of. There's a whole separate chapter addressing that program in Alaska, and then Congress said, and if you want to expand from Alaska, here's how you can go about doing that. And that's exactly what Swinomish and other tribes in Washington have done. That's what the state of Washington have done. We are trying to carry out the programs that Congress established, and that Congress established as part of its efforts to carry out the trust responsibility, which ultimately springs from the government-to-government relationship between tribes and the United States that's recognized in the Constitution and the treaties. In the case of Swinomish, the Treaty of Point Elliot, Article 14 of which, specified that the federal government would provide health care to the tribe. Thank you. Thank you. May it please the Court, Sarah Clark for the United States. I think the parties are generally in agreement that the mid-level dental practitioners at issue here are qualified, as the Court understood that term in Betlac, to provide dental services to the general population, and the state has nevertheless restricted those providers to tribal populations only. I think just going to the Court's focus on willingness, it's certainly fine for a tribal provider or any provider to be unwilling to serve a particular beneficiary, but here the sort of willingness restrictions come from the state law. The state law has said, you can only serve tribal populations, and then it says, well, those populations are subject to restrictions on who they can serve, therefore, these DHATs are not willing to serve anyone else, therefore, there's no free choice of provider problem. Doesn't the federal law already restrict them if they're under the umbrella of the Indian Health Service to providing for tribal or related members? So federal law does restrict who tribal providers can serve, but it certainly doesn't require the state to restrict mid-level dental practitioners to tribal populations only. So it's that restriction, that sort of putting this entire provider category only, you know, available to some Medicaid beneficiaries. This just seems like such a tempest in a teapot to me, because do you have any evidence that anyone's gone there and said, I would like to have some of your services, and were rejected? So there doesn't need to be, you know... Is there any evidence? I don't think there's any particular evidence, one way or the other, of whether anyone has gone and tried to obtain services. So what you're saying is, well, if they did, and then they were declined, then we would have a problem? Well, so the agency is required to disapprove any state plan that's inconsistent with the Medicaid statute, and the Medicaid statute obviously says that any individual eligible for Medicaid has to be able to go to any provider who's qualified to perform the services, as long as they're willing. And so... And these individuals are not willing? But they're not willing by virtue of state law. The state has sort of imposed this restriction and said... So I come back to the question, which I think, unfortunately, is not addressed in the record, which was, what was the state's reason for imposing that restriction? If the state had imposed that restriction on everything but this one area, because it thought these folks weren't qualified, in the legislature's view, to administer these tests, that would be one thing. If, on the other hand, they simply said, well, this is a compromise between the economics of the dental profession as a whole and the needs of this very poor community, on the other hand, that would be a very different analysis. So don't we need to know something about what was the legislative history of this legislation? So certainly the state does think that these practitioners are qualified in the sense of capable of providing the medical services, whether there's... Let me give you a different example to try to make my point. It may not be helpful, but that won't stop me. Supposing the state said no doctor may qualify for Medicaid and no patient of a doctor may qualify for Medicaid unless the doctor has had 24 hours of training in an accredited hospital, except if the doctor is in a very rural area where there are no hospitals within 100 miles, in which case, in my hypothetical, he doesn't have to have that training. Now, wouldn't that be a determination by the legislature that basically you're not qualified to be a doctor and administer these services and receive Medicaid reimbursement for it unless you have this training, but we recognize that rural areas have special needs and special difficulties, and so we make an exception. Would that be, in your view, a statute that would be permissible under this Medicaid regulation or not? So if the state law is putting a provider off-limits for reasons unrelated to qualifications, and it sounds like that might be the case in your hypothetical, then that's not acceptable. But if the state has policy reasons why it thinks that sort of diverting from the free choice of provider requirement in a certain situation will serve the overall goals, you know, this rural area really needs these providers, what it can do is go to CMS and say, we'd like a waiver of the free choice of provider requirement so that we can extend these services to the subset of Medicaid beneficiaries and not extend them to others at this time. But where the federal requirement is coextensive with the state requirement, I'm having some trouble why the federal government is objecting to the state requirement. Well, so again, within the kind of tribal provider universe, they are coextensive, but there's a whole universe of other Medicaid beneficiaries outside who are not able to access these mid-level dental practitioners. So because the state has said these mid-level dental practitioners can only serve people who are eligible under IHS criteria, basically, yes, in that world, the federal and state laws, restrictions are coextensive, but there was no sort of need necessarily for the state to put those providers only in that. But their hands are also tied by the Indian Health Service guidelines and umbrella that they operate under. So what you would like is if the law didn't exist, then everything that's going on now would be fine? So if the law didn't exist, yes, tribes could continue to have DHATs, they could continue to choose who to serve or who not to serve. What the state has done is created a provider type that's only available to tribal populations. And that makes them unwilling. Just like if I were a doctor and someone came to me and I'm a qualified doctor, I would have within certain discrimination and other restrictions the ability to say, sorry, I'm not going to provide for you. I could do that. An individual provider can do that, and that could be a tribal provider, it could be someone else, but the state can't impose that limitation on providers from the outside because then it's sort of basically interfering with providers' ability to choose and with beneficiaries' ability to go to. It's like we're in this Mobius strip of an argument because the Indian Health Service provider can't provide to someone that's not within this tribal circle, correct? That's correct. Okay. And the state says, that's true, you can't. And so now you're saying, well, you've now circumscribed the free choice, not of the applicant or the patient, but of the provider. Well, it's also circumscribed the free choice of all of the Medicaid beneficiaries who can't go to tribal providers. So all of those Medicaid beneficiaries are each, you know, being subject to this state restriction that is not related to them. If there's no state restriction and a non-tribal person shows up in the Swinomish facility, they will be told, I'm sorry, we can't provide to non-tribal members, correct? That's correct in the tribal context. In the tribal context. So we're kind of right back where we started. It just seems like a distinction without a difference that you've got the state basically confirming what the federal government says with respect to who can be served by these Indian Health Service affiliated services, right? Right. But just to back up, I mean, the fact that DHATs in Washington can only serve tribal populations is not related to whether those DHATs are qualified to serve other Medicaid beneficiaries. So, you know, the state agrees that the same DHATs who are serving on reservations can, you know, fill cavities, they can conduct community outreach, they can inspect teeth, and they could do that just as well for all of the Medicaid beneficiaries who can't go to tribal providers. So it's all of those beneficiaries whose free choice of provider rights are, you know, infringed by this state law restriction saying this provider type can only serve. What seems odd to me is that a doctor or other provider can just say, sorry, Charlie, I don't want to serve you. And you're now saying, in effect, you're creating this hypothetical situation where someone could show up somewhere and get service. And, in effect, what's the difference between the person saying, I'm not going to serve you and I'm not going to serve you because I'm on the reservation or the tribal facility? Right. So the Medicaid statute doesn't allow states to impose limits on sort of qualified providers and sort of the access of Medicaid beneficiaries to go see those qualified providers. So the problem is when the state – I mean, if the state decided that you had to practice medicine for 52 years in order to be a qualified provider, would that be okay? So states have discretion to decide, you know, what – say yes or no. And then maybe you can explain. Sure. I think, yes, it is okay for states to say you need to have a certain amount of experience to be qualified. But here, where we have agreement between the parties that these providers have the technical skills, which is what the court in Betlac said is sort of the question when it comes to qualified, there's no argument here that what the state is doing is, you know, saying, oh, you're not really qualified to serve these other Medicaid beneficiaries. They agree that they are qualified to serve the other Medicaid beneficiaries. And so the state has imposed a restriction unrelated to that qualification, and that's not permissible by the free choice of provider requirement. And that's true even if on day one there is no sort of patient knocking down the door or no DHAT who's saying, you know, I wish I could serve a broader population and I can't because the state – If they applied for a waiver, would they get a waiver? So the agency certainly can't promise in advance that they would get a waiver, but the agency has offered repeatedly to work with the state on a streamlined waiver application. And obviously, as we have said, we support the goals of the DHAT program and want to find a solution. Has the agency interpreted the phrase willing in this context? So I think the deputy administrator's decision addresses willing by saying they put these providers off limits to many Medicaid beneficiaries. I don't think – you know, he didn't have a – Where would you say in the decision is the closest to interpreting this? So, again, I'm not saying that the deputy administrator said, you know, that are not permissible. So let's see. I mean, I think – you know, I take Your Honor's point that you're looking for where he discussed willing. I am kind of looking. I realize it's a 16, 18-page decision. Right, right. I mean, I think one area where this kind of issue was touched on, even if the word willing wasn't used, you know, the deputy administrator said, CMS disapproved the proposed SPA because the state, not the tribe, will treat as qualified only those DHAP practitioners that provide services to people who are members of federally recognized tribe or otherwise eligible. And I understand that there he's talking about qualified, but here they really run together because the state is, you know, has imposed this restriction on beneficiary access and on, you know, who a provider can see and said that that same restriction, you know, So in the decision, page 14, there's a statement, you know, to put it another way, there is a free choice of DHAP providers available in accordance with the statutory chapter. What does that mean? I'm just looking at that in context. I see that this is where the deputy administrator was describing the state's arguments. Right. So, I mean, on page 14, I think the deputy administrator is just, you know, rephrasing what the state has said. I think its analysis begins later in the decision at page 16 under the finding section. That's where it gets into, you know, what is really the issue here? And the issue is that the state has created a provider type that is only available to a subset of Medicaid beneficiaries. And it's done so for a reason that is not related to whether those providers are qualified to serve a broader Medicaid population or not. So I know this sounds like a broken record, but why isn't the portion of the Washington state law that says that these dental hygienists can't provide services outside the tribal area? Why isn't that a determination that they're not qualified? Well, I think we can take the state's representations in its brief and the statement of its own witnesses at the hearing saying that these DHAPs have the technical skills to perform these services to non-tribal Medicaid. But the state said they're not, in effect, qualified to do so within our medical licensing scheme. Right. But that statement is not consistent with how this court understood the term qualified in the Planned Parenthood Arizona case where it said qualified means capable of providing the services and said, you know, it's not. You're focusing on what is part of my dilemma because undoubtedly that was said in that case. But then at the very end of the case, this court said, quote, nothing in either the Medicaid Act's free choice of provider requirement or the practice of medicine within its borders. HB 2800, which was the provision there, is a public funding statute conditioning the receipt of state monies on the range of services that a health care provider offers. It does not have any effect on whether a provider is authorized to practice medicine in Arizona, close quote. So that seems to be taking a state policy determination of who is qualified or who is not qualified, as opposed to the earlier language in the very same opinion that seems to say it's really a question of kind of medical proficiency. How do you reconcile that? Well, so I think taken as a whole, the logic of the opinion makes clear that qualified is this question of are you capable to provide the services? You know, can you do the filling? I think the language at the end of the opinion that you're pointing to is saying, you know, there is state discretion to say, you know, a mid-level dental practitioner can provide this kind of services. Or, you know, mid-level dental practitioners need six months of training or a year of training. So there's a universe of kind of qualification-related questions that states certainly have authority to act within. But the opinion overall and the plain text of the Medicaid statute, as the court analyzed it, make clear that qualified is tied to the skill of qualified state to serve whatever policy goals the state might have. So the state couldn't say that, well, not paralegals, but paraprofessionals in the medical profession are not generally authorized to practice except in areas where the average yearly income falls below X. Would the state do that? So in that situation, it sounds like so I think it actually might depend on what the sort of cap is because if that provider type was available to all every Medicaid beneficiary would have access to the qualified provider. And, in fact, some states that have authorized mid-level dental practitioners have said, you know, you have to serve in kind of like at a place that serves underserved populations, low-income populations. So that absolutely is permissible if the provider is available to the full universe of the Medicaid beneficiary. Well, you know, you've now shifted it. The way it reads, the question is whether it's the Medicaid recipient or the Medicaid provider. And it seems like we are mixing and matching because as you read the statute, you know, it talks about an individual being able to go to someone who's qualified and willing. And so the willingness is not tied to the applicant or the person that needs the services. Do I read that correctly? May I briefly respond? Yes. So, yes, Your Honor, the free choice of provider requirement obviously is tied to the beneficiary and their sort of right and ability to access the provider. I think one reason why we've been focusing or why I've been focusing on the provider restrictions is because that's how the state law here sort of imposes the limitation on beneficiary access by limiting who the provider can serve. So it's, you know, it said providers, you can only serve these types of beneficiaries and not others. And the effect of that is to have a situation where not any individual eligible for Medicaid assistance can go to any qualified provider. Counsel, if I may ask a question, please. Would it be possible to say that the DHATs are not willing, as a matter of law, to provide services to any beneficiary outside the tribal limits because the state law and the federal law prohibits that? So we don't think that's the best reading of the free choice of provider requirement because we don't think the state has the ability, consistent with the Medicaid statute, to impose that limit on who this provider type can serve and still get Medicaid reimbursement. You know, I'll stop there. But is it your position that the only way the tribe could do this program would be to apply for a waiver of the free choice provision? So two points. So the tribe certainly can continue to use DHATs even if there is no state law in place. So the tribe is free to continue on that path. If they want to get Medicaid reimbursement for it, then I think there are two main paths that the state could take. It could either apply for a waiver of the free choice of provider requirement, which the agency has said it stands ready to assist with, or it could take the approach that other states have taken, Nevada, Arizona, and authorize these mid-level dental practitioners more broadly such that there is no free choice of provider requirement problem and such that the state plan amendment would be approvable. Thank you. Thank you. Mr. Stevens? So the obvious question is why not just get a waiver? Let me address that. First of all, counsel herself just admitted that there's no guarantee that the federal government would grant the waiver. And a waiver application takes years. The state needs to put together all sorts of materials with regard to finances. The state needs to do public hearings. The state needs to engage in tribal consultation. This is the path that, as we explained in one of our filings, that we did start down at CMS's invitation after the final decision was issued. However, tribal opposition was made very clear to both CMS and the state, and the state decided not to pursue it. In addition, so first of all, we don't even know if a waiver would be granted. Second of all, waivers are always time limited. They're a maximum of five years. The dental, the oral health care crisis is a permanent problem, not a temporary problem. A waiver is a temporary solution at best to a permanent problem. Finally, CMS, always in these 1115 waivers, reserves the right to terminate the waiver at any time and for any reason. That does not provide assurance to the state or the tribe that there would be long-term Medicaid funding for these critically needed services. A waiver is not an escape valve from this issue. In addition, we've established that the state plan is approvable under the Free Choice Law. I'd note, Your Honor, Judge McEwen, I couldn't agree with you more when you said this is a tempest in a teapot. Washington's eligibility criteria are exactly the same as the federal eligibility criteria. There's no difference, nothing more, nothing less. Washington simply incorporated the federal criteria by reference into its law. So it's rather ironic for the federal government to say that it can't approve the amendment because of state restrictions. The state restrictions are the federal restrictions. There's nothing new or different here. And eligibility criteria for services at tribal clinics have existed for decades, and CMS has never objected until this case and only for this case. Thank you. Thank you very much, Your Honor. Thank you. The case just argued is submitted, Washington State Healthcare v. Centers for Medicare and Medicaid Services. Thank you all for your arguments and also the briefing. A lot of complicated statutory provisions moving together, moving parts here. So we appreciate the briefing as well. Thank you, and with that, we're adjourned for the morning.
judges: McKEOWN, GOULD, Rakoff